UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------X

In re:

SUPREMA SPECIALTIES, INC., et al.,

        Debtors,

HARLEYSVILLE WORCESTER MUTUAL
INSURANCE COMPANY and
LUMBERMENS MUTUAL CASUALTY
INSURANCE COMPANY,

        Plaintiffs-Appellants,

        - against -

BANK OF AMERICA, N.A., as successor by
merger to FLEET NATIONAL BANK, as
agent for the Senior Secured Lender Group,
SUPREMA SPECIALTIES, INC., SUPREMA
SPECIALTIES WEST, INC., SUPREMA
SPECIALTIES NORTHEAST, INC. and
SUPREMA SPECIALTIES NORTHWEST,
INC.,

        Defendants-Appellees.

---------------------------------------------------------X

**USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/7/07**

**OPINION AND ORDER**

**06 Civ. 6021 (SAS)**

**:Adv. Pr. No.: 02-02293(JMP)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

Plaintiffs, Harleysville Worcester Mutual Insurance Company

("Harleysville") and Lumbermens Mutual Casualty Insurance Company

("Lumbermens") (collectively, "the Sureties"), have appealed an Order of the

-1-

United States Bankruptcy Court, Southern District of New York, dated June 27,

2006 (the "Order").[1]  In that Order, United States Bankruptcy Judge James M.

Peck: (1) granted summary judgment in favor of the Bank Group;[2] (2) denied the

Sureties' motion for summary judgment; and (3) dismissed the Sureties' Third

Amended Complaint with prejudice.  The issue raised in this appeal is whether the

Bankruptcy Court erred in granting summary judgment in the Bank Group's favor

with respect to the Sureties' equitable subrogation and express trust claims.  For

the following reasons, the Order of the Bankruptcy Court is affirmed.

## I.    BACKGROUND[3]

### A.    The Parties to this Proceeding

The debtors in this case, Suprema Specialties, Inc., Suprema

---

[1]     For a discussion of the legal analysis underlying the Order, *see In re
Suprema Specialties, Inc.*, No. 02-02293, 2006 WL 2583648 (Bankr. S.D.N.Y.
June 8, 2006) (Opinion Denying Plaintiffs' Motion for Summary Judgment and
Granting Defendants' Motion for Summary Judgment).

[2]     The "Bank Group" is a consortium of financial institutions represented by
Fleet National Bank which was subsequently succeeded, through merger, by Bank
of America, N.A.  The Bank Group includes: Citibank, N.A.; First Pioneer Farm
Credit, ACA; PNC Bank, National Association; GE Capital CFE Inc.; General
Electric Capital Corp.; United Trust Bank; and Sovereign Bank.

[3]     Unless otherwise indicated, the following facts are taken from the Record
on Appeal including, in particular, Plaintiffs' and Defendants' Stipulation of
Undisputed Material Facts Pursuant to Local Bankruptcy Rule 7056-1 for the
Southern District of New York.

Specialties West, Inc., Suprema Specialties Northeast, Inc., and Suprema

Specialties Northwest, Inc. (collectively "Suprema") were manufacturers,

marketers and distributors of soft cheeses, licensed by the New York

Commissioner of Agriculture and Markets (the "Commissioner") as milk dealers.

Appellee, Fleet National Bank, subsequently succeeded through

merger by Bank of America, N.A., (the "Agent"), is a member of and agent for the

Bank Group. The Agent, on behalf of the Bank Group, is a secured lender holding

priority liens on Suprema's assets, including accounts receivable. At the time

Suprema filed its Chapter 11 petition for bankruptcy protection on February 24,

2002, Suprema was indebted to the Bank Group in the principal amount of

approximately $97,565,837.50, plus interest and fees.

Appellants, Harleysville and Lumbermens, are two surety companies

that executed a bond on behalf of Suprema for the payment of Suprema's

obligations to milk suppliers. Months after Suprema's Chapter 11 bankruptcy

filing and subsequent conversion to Chapter 7, the Sureties were called upon to

pay $3,882,571.19 under the bond. The Sureties claim that they are entitled to

recover this amount from Suprema and/or the Bank Group notwithstanding the

Bank Group's first priority lien on all of Suprema's assets.

**B.    The Bank Group's Perfected Security Interests in Suprema's Assets**

On September 23, 1999, the Bank Group entered into a Third Amended and Restated Revolving Loan, Guaranty and Security Agreement ("Loan Agreement") with Suprema as borrower.  Under the Loan Agreement, Suprema could borrow up to $140,000,000 from the Bank Group.  To obtain loans under the Loan Agreement, Suprema had to submit a "Borrowing Base Certificate," certified by its chief financial officer each calendar month, demonstrating that Suprema maintained an appropriate ratio of loans outstanding to eligible receivables and eligible inventory, as defined in the Agreement.  As customary in the asset-based financing arena, the Loan Agreement required Suprema to maintain its operating accounts with the Agent.  The Loan Agreement also granted the Agent, on behalf of the Bank Group, a right to set off obligations due to it under the Loan Agreement against Suprema's deposits held by the Agent or any other member of the Bank Group.  Finally, the Loan Agreement provided that the line of credit extended to Suprema was secured by a first priority lien and security interest on all of Suprema's assets, property and proceeds thereof, including accounts receivable, inventory, contract rights, and deposits.[4]

---

[4]    It is undisputed that the Agent perfected the Bank Group's security interests by filing the financing statements as required under the Uniform Commercial

### C.   The Sureties' Relationship to Suprema

To obtain a license as a milk dealer in New York State, section 258-b of New York's Agricultural and Markets law required Suprema to provide the Commissioner with a bond or other security guaranteeing the prompt payment of its obligations to milk suppliers.[5]  That statute also establishes procedures for a milk supplier to recover payment from the Commissioner in the event of a payment default by a milk purchaser.  Under the statute, the milk supplier must first file a claim with the Commissioner, which prompts an audit and investigation of the claim.  After completion of the audit and a determination and certification of the amount due, the Commissioner then makes a demand to the surety that provided the bond as a guarantee for payment.[6]

On October 15, 2001, almost two years after the Bank Group perfected its security interest in Suprema's assets, the Sureties issued such a bond in the amount of $5,100,000 to Suprema Northeast, Inc., as principal, naming the Commissioner as the beneficiary (the "Bond").  By its terms, the Bond was in effect between July 1, 2001 and June 30, 2002.  Suprema also executed two

---

Code ("UCC").

[5]     *See* N.Y. Agric. & Mkts. Law § 258-b.

[6]     *See id.* §§ 258-b(5)(c) to b(5)(d), 258-b(9).

indemnity agreements[7] to protect the Sureties in case they were required to make

payment under the Bond. By their terms, each indemnity agreement inures to the

benefit of both sureties. For purposes of this appeal, the Sureties rely solely on the

language in the Harleysville General Agreement of Indemnity (the "Indemnity

Agreement").[8]

> The Indemnity Agreement seeks to create collateral security for the

benefit and payment of all obligations for which the Sureties may be liable under

the Bond. Section 2 of the Indemnity Agreement provides that upon the Sureties'

demand to establish a reserve deposit, Suprema would be required to deposit with

the Sureties a sum of money equal to such reserve as collateral security. The

Sureties made no demand for a reserve deposit and Suprema did not deposit funds

with the Sureties. The Sureties claim that Section 4 of the Indemnity Agreement

creates a trust consisting of "[a]ll payments received for or on account of any

CONTRACT" and "[a]ll monies due and to become due under any CONTRACT"

---

[7]     The indemnity agreements consist of a "General Agreement of Indemnity" in favor of Harleysville and a "Commercial General Indemnity Agreement" in favor of Lumbermens.

[8]     The two indemnity agreements are materially different. For example, the Lumbermens agreement does not purport to require Suprema to create a trust on behalf of the Sureties. However, because there is no dispute that the Harleysville Indemnity Agreement by its terms inures to the benefit of both Sureties, the parties agree that the Lumbermens agreement is irrelevant to this appeal.

-6-

– and provides that, upon demand by the Sureties and "in implementation of the trust," Suprema would open an account designated as a trust fund.  The Indemnity Agreement, however, did not restrict Suprema's use of any payments it received under the Bond.  Furthermore, Section 4 expressly provides that the alleged trust funds could be commingled with other funds.

As the Bankruptcy Court found – and the Sureties do not dispute – at the time the Sureties posted the Bond and entered into the Indemnity Agreement, the Sureties knew that the Bank Group had a perfected security interest in all of Suprema's assets.  At no time, however, did the Sureties ever file UCC financing statements to perfect their interests under the Indemnity Agreement.  The Sureties made no demand that Suprema segregate any funds for the Sureties' benefit and Suprema did not segregate any funds.  Furthermore, the Sureties made no demand that Suprema open an account designated as a trust fund and Suprema never established such an account.

### D.   Events Leading to Suprema's Bankruptcy Petition

On December 21, 2001, Suprema issued a press release disclosing the sudden resignations of its Chief Financial Officer, Steven Venechanos, and Comptroller, Arthur Christensen.  On the same day, the Securities and Exchange Commission commenced an investigation of Suprema while NASDAQ suspended

-7-

trading in the company's stock. By the end of January 2002, the Federal Bureau

of Investigation, the Food and Drug Administration, the New Jersey Department

of Health, and the New Jersey Department of Agriculture each had started their

own investigations of Suprema. These investigations ultimately revealed that

Suprema's reported growth in the past was illusory and was produced, in large

part, by a fraudulent scheme carried out by its officers. Indeed, the fraud was in

large part directed at the Bank Group. The Borrowing Base Certificate for the

month ending December 31, 2001, delivered to the Bank Group on January 23,

2002, indicated that Suprema had an outstanding debt of $94,942,557 to the Bank

Group and that it was eligible to borrow an additional $13,342,938. The Bank

Group subsequently discovered that certain items listed as Eligible Receivables

and Eligible Inventory on the previously submitted Borrowing Base Certificates

were fictitious and that the collateral securing loans made under the Loan

Agreement was worth significantly less than Suprema had represented to the Bank

Group.

On January 30, 2002, the Agent, on behalf of the Bank Group, sent

Suprema a reservation of rights letter advising Suprema that it was in breach of the

Loan Agreement and that the Bank Group had decided to discontinue extending

credit to Suprema, as was permitted under the Loan Agreement. In early February

-8-

2002, the Bank Group commenced a review of Suprema to determine the extent of the Bank Group's exposure on Suprema's outstanding indebtedness. As provided in the Loan Agreement, the Bank Group received confidential information relating to Suprema's operations and financial condition. The Bank Group and Suprema subsequently engaged in discussions to ascertain whether, given the challenges facing the company, any aspect of Suprema's businesses could be salvaged in an attempt to reduce the Bank Group's large exposure.

Suprema retained an independent crisis management firm on February 4, 2002. The crisis management firm was hired in an attempt to stabilize Suprema's business operations. The retention agreement expressly permitted the crisis manager to share information about Suprema with the Bank Group. The retention agreement also instructed the crisis manager to limit disbursements to those that were absolutely necessary. Ultimately, however, the crisis manager failed to obtain control over Suprema's cash flow.

Suprema terminated the first crisis manager on February 19, 2002. The next day, Suprema hired another crisis management firm. A few days later, the second crisis manager determined that a bankruptcy filing would be the best means to gain control over Suprema's cash flow and to reorganize any business units that could be salvaged. In anticipation of the bankruptcy filing, the crisis

-9-

manager advised Suprema to cease all payments to creditors, except for legal fees

and payroll expenses until Suprema could secure a debtor-in-possession financing

order.

On February 19, 2002, the Agent, on behalf of the Bank Group,

advised Suprema of a number of additional defaults under the Loan Agreement.

The Bank Group exercised its right under the Loan Agreement to setoff all

deposits in Suprema's accounts, with the exception of trust funds.  The Bank

Group subsequently took possession of the funds in those accounts.  Thereafter, on

February 24, 2002 (the "Petition Date"), Suprema filed a voluntary petition for

relief under Chapter 11 of the Bankruptcy Code.[9]  On the Petition Date, Suprema

was indebted to the Bank Group in the principal amount of approximately

$97,565,837.50, plus interest and fees.

### E.    The Payments at Issue in this Proceeding

Allied Federal Cooperatives, Inc. ("Allied") is a federation of New

York dairy farm cooperatives which sold milk to Suprema under a Milk Supply

Agreement dated July 1, 1996.[10]  The milk sold by Allied to Suprema was subject

---

[9]     11 U.S.C. § 101 *et seq.*

[10]    Subsequent amendments to the Milk Supply Agreement did not change any
of the terms relevant to this proceeding.

to Part 1001 – Milk in the Northeast Marketing Area (the "Northeast Federal Order"), a federal regulation administered by the United States Department of Agriculture to regulate sales of milk in the Northeast Marketing Area.[11]  The Northeast Federal Order establishes the dates by which milk dealers must pay milk producers.[12]  Section 1001.73 requires that a milk dealer (Suprema) pay its supplier (Allied) on or before the twenty-sixth day of any delivery month for milk received during the first fifteen days of that month.  The balance owed for any month must be paid by the dealer to the supplier no later than the sixteenth day of the following month.[13]  In the event of a milk dealer's breach or failure to perform, a non-defaulting milk supplier could terminate the agreement upon written notice and bring an action to collect the money due.

Although Suprema historically used much of the milk it purchased from Allied to produce "soft cheeses," it also re-sold excess milk to others.  In particular, Suprema re-sold milk purchased from Allied through Dairy Market

---

[11]     *See* 7 C.F.R. Part 1001.

[12]     *See* 7 C.F.R. § 1001.73.

[13]     In particular, the Northeast Federal Order required Suprema to pay Allied by January 26, 2002 for milk received January 1-15, 2002; by February 16, 2002 for milk received January 16-31, 2002, and any balance owing for milk purchased January 1-15, 2002; by February 26, 2002 for milk received February 1-15, 2002; and by March 16, 2002 for milk received February 16-24, 2002, and any balance owing for milk purchased February 1-15, 2002.

Services, LLC ("DMS")[14] pursuant to an agreement between Suprema and DMS

dated December 1, 2000 (the "DMS Contract"). Under the terms of the DMS

Contract, Suprema was to deliver milk purchased by DMS to Kraft. Suprema

received payments directly from Kraft and Dairy Lea for milk sold through DMS

to Kraft.

During the forty-day period prior to the Petition Date, Suprema

continued to purchase milk from Allied. Between January 15, 2002, and February

23, 2002, Suprema purchased $3,888,571.19 worth of milk from Allied. Suprema

re-sold a portion of this milk to DMS under the DMS Contract. Suprema did not

make the payment due on Feburary 16, 2002, or thereafter. On February 19, 2002,

Allied demanded payment from Suprema in the amount of $1,700,000 for milk

delivered between January 15, 2002, and January 31, 2002. Suprema did not

respond to this demand, or any subsequent demands, for payment.

On February 19, 2002, Suprema received a wire transfer of

$907,402.67 into its operating account from Dairy Lea for milk delivered to Kraft

between January 15, 2002 and January 31, 2002. Between March 11, 2002 and

March 28, 2002, Kraft and Dairy Lea remitted three additional payments, totaling

---

[14]     DMS is a partnership between Dairy Farmers of America and Dairy Lea
Cooperative Inc. ("Dairy Lea").

$1,455,294.77, for milk delivered between January 15, 2002 and February 23, 2002. The Sureties have thus identified approximately $2,362,297 in payments made by Kraft and Dairy Lea to Suprema for milk sold under the DMS contract (the "Milk Sales Proceeds").[15] The post-petition Milk Sales Proceeds were included in the approximately $12.6 million distributed from Suprema's estate to the Bank Group by the Bankruptcy Court between the Petition Date and December 2002.

On May 3, 2002, the Commissioner made a claim under the Bond for payment of $3,882,571.19 based on Suprema's failure to pay Allied for milk purchased between January 15, 2002, and February 23, 2002. According to the Commissioner's determination, the milk sold to Suprema was subject to the Northeast Federal Order which required Suprema to pay Allied for the milk it purchased according to the prescribed timetable. On June 5, 2002, more than three months after Suprema filed for bankruptcy, the Sureties paid the Commissioner $3,882,571.19 on the Bond. The Sureties seek to recover this amount (the "Bonded Transaction Assets") from Suprema's bankruptcy estate and/or from the Bank Group.

---

[15]     It appears that this figure should be $2,362,697, but the four-hundred dollar difference is immaterial.

**F.     The Proceedings Below**

After filing its Chapter 11 petition for reorganization on February 24,

2002, Suprema was allowed to continue operations as a debtor-in-possession.  On

March 20, 2002, the Bankruptcy Court converted Suprema's case to a Chapter 7

liquidation and appointed Kenneth P. Silverman as the Chapter 7 Trustee.  The

Sureties commenced this adversary proceeding on May 6, 2002, challenging the

priority of the Bank Group's liens and security interests.  In the Third Amended

Complaint ("Complaint"), filed on April 25, 2003, the Sureties assert four claims.

The first claim is that Suprema breached its contractual obligations to indemnify

the Sureties.  Under the three remaining claims, the Sureties seek to recover from

the Bank Group the amount paid out on the Bond ($3,882,571.19), the so-called

"Bonded Transaction Assets."  According to the Sureties, their entitlement to this

amount from Suprema's estate is superior to any rights held by the Bank Group

under four alternative theories: (i) equitable subrogation arising out of Suprema's

default in paying Allied, which ripened into the Sureties' post-petition payment to

the Commissioner under the Bond; (ii) an express trust on the Bonded Transaction

Assets in favor of the Sureties in accordance with the Indemnity Agreements; (iii)

an assignment of the amount in issue to the Sureties under the Indemnity

Agreements; and (iv) equitable subordination.  The Sureties contend under each of

-14-

these theories that an amount equal to the Bonded Transaction Assets was set aside from Suprema's property for the Sureties' exclusive benefit and never became part of Suprema's estate.[16]  Thus, according to the Sureties, the contested amount of money is not subject to the Bank Group's priority liens.  The Bank Group and the Trustee answered the Complaint on May 30, 2003, denying liability.

On March 14, 2006, the Sureties filed a motion for summary judgment on all of their claims.  The Bank Group opposed the Sureties' motion and cross-moved for summary judgment on the Sureties' express trust, assignment, equitable subrogation, and equitable subordination claims.  The Trustee also opposed the Sureties' motion, joined the Bank Group's cross-motion, and moved for dismissal of the Complaint.  On April 28, 2006, the Sureties withdrew their claim for relief based on the doctrine of equitable subordination.  On June 8, 2006, the Bankruptcy Court denied the Sureties' motion and granted the Bank Group's cross-motion for summary judgment on the Sureties' express trust, assignment and equitable subrogation claims.

---

[16]     *See, e.g.*, Brief for Plaintiffs-Appellants at 1 ("[T]he surety's [sic] equitable lien, in the context of a bankruptcy proceeding, prohibits the bonded transaction assets from becoming part of the debtor's bankruptcy estate."); *id.* at 21 ("The Debtors' Estate Does Not Include Assets Subject to the Sureties' Equitable Rights or Assets Held in Trust for the Sureties").

-15-

The Bankruptcy Court concluded that the Bonded Transaction Assets were part of Suprema's bankruptcy estate and that the Bank Group had a priority claim to that amount. The Bankruptcy Court first rejected the Sureties' equitable subrogation claim, noting that "[e]quitable subrogation gives the surety that pays under its bond the right to recover amounts advanced on behalf of a principal by allowing the surety to substitute itself for the creditor whose claim has been satisfied, but this right does not extend to stripping away property from the estate or trumping the properly perfected liens of other creditors."[17]  Accordingly, the Bankruptcy Court held that the Sureties' subrogation rights "give them no more than the rights that Allied would have had as an unsecured seller of milk – the rights to assert unsecured claims for Suprema's failure to pay and breach of contract."[18]  The Bankruptcy Court also found that the Sureties' equitable subrogation rights "were contingent or inchoate when the default occurred on February 16, 2002, and given the nature of the Sureties['] undertaking to the Commissioner, these rights could not be asserted until payment under the Bond."[19] Because the Sureties did not make payment under the Bond until months after the

---

[17]  *In re Suprema*, 2006 WL 2583648, at *9.

[18]  *Id.*

[19]  *Id.*

-16-

Petition Date – at which point there were no identified assets or proceeds outside of the bankruptcy estate – the Bankruptcy Court determined that the Sureties' claim for subrogation gave them only "the right to receive a percentage distribution as members of the class of unsecured creditors" under Suprema's bankruptcy plan.[20]

The Bankruptcy Court also rejected the Sureties' express trust claim, holding that the Indemnity Agreement did not demonstrate that the parties intended to establish a trust over the Milk Sales Proceeds or the Bonded Transaction Assets based on "the failure to identify [in the Indemnity Agreement] a separate trust fund for payments made to Suprema" and other ambiguities in the Indemnity Agreement.[21]  The Bankruptcy Court also found that the parties' conduct was not consistent with a trust relationship because "the commingling of funds," which was expressly permitted under the Indemnity Agreement, "effectively destroys any ability to separately identify the subject matter of the alleged trust at this point, and is consistent with a debtor-creditor relationship, not a trust."[22]

---

[20]    *Id.*

[21]    *Id.* at *11.

[22]    *Id.* at *13.

-17-

Finally, the Bankruptcy Court rejected the Sureties' assignment claim. The Court noted that the Indemnity Agreement did not identify the funds allegedly assigned to the Sureties.[23]  Moreover, the Sureties did not take any action, such as the filing of UCC financing statements, to perfect their claim to the contested funds.[24]  As a result, the Bankruptcy Court concluded that "the unperfected assignment claim of the Sureties is insufficient to defeat the superior claim of the Bank Group."[25]

On June 27, 2006, the Bankruptcy Court entered a final order granting defendants' motion for summary judgment and dismissing the Sureties' Complaint.[26]  The Sureties timely filed a Notice of Appeal on July 6, 2006.

## II.    LEGAL STANDARD

District courts are vested with appellate jurisdiction over bankruptcy court rulings.[27]  Final orders of the bankruptcy court may be appealed to the

---

[23]    *See id.*

[24]    *See id.*

[25]    *Id.*  The Sureties are not appealing the Bankruptcy Court's holding with respect to their assignment claim.  Accordingly, this claim is waived. *See Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006) (waiving argument raised at summary judgment hearing but not pressed on appeal).

[26]    *See* Bankruptcy Court's June 27, 2006 Order.

[27]    *See* 28 U.S.C. § 158(a).

district court as of right.[28]  An order is final if "[n]othing in the order . . . indicates any anticipation that the decision will be reconsidered."[29]

A district court functions as an appellate court in reviewing judgments rendered by bankruptcy courts.[30]  Findings of fact are reviewed for clear error.[31]  A finding of fact is clearly erroneous if the district court is "'left with the definite and firm conviction that a mistake has been committed.'"[32]  A bankruptcy court's conclusions of law, by contrast, are reviewed *de novo*.[33]  Because the parties agree that there are no factual issues in dispute, *de novo* review is required here.[34]

---

[28]    *See id.* § 158(a)(1).

[29]    *In re Palm Coast, Matanza Shores Ltd. P'Ship*, 101 F.3d 253, 256 (2d Cir. 1996).

[30]    *See In re Sanshoe Worldwide Corp.*, 993 F.2d 300, 305 (2d Cir. 1993) ("[Appellant] relies on several cases for the reasonable proposition that the district court acts as an appellate court in reviewing a bankruptcy court's judgments.").

[31]    *See* Fed. R. Bankr. P. 8013 ("Findings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."). *Accord In re Cody, Inc.*, 338 F.3d 89, 94 (2d Cir. 2003).

[32]    *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1388 (2d Cir. 1990) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

[33]     *See In re Cody, Inc.*, 338 F.3d 89, 94 (2d Cir. 2004); *In re 139-141 Owners Corp.*, 313 B.R. 364, 367 (S.D.N.Y. 2004).

[34]    *See* Brief for Plaintiffs-Appellants at 3 n.3 ("[T]he Bankruptcy Court was not called upon to resolve any relevant factual issues given the parties' Statement of Undisputed Material Facts filed with the Bankruptcy Court on April 14,

## III.   DISCUSSION

The central question raised in this appeal is whether the Bonded Transaction Assets are part of Suprema's bankruptcy estate.  The Sureties do not, nor could they, dispute that if that money is part of the bankruptcy estate, it was properly distributed to the Bank Group based on its first priority lien and security interest.  The Sureties argue that under the doctrine of equitable subrogation, they obtained an equitable lien in an amount equal to the Bonded Transaction Assets, which had the effect of excluding these assets from the bankruptcy estate. Alternatively, the Sureties argue that the Milk Sales Proceeds were subject to an express trust held by Suprema for the benefit of the Sureties.  As the Bankruptcy Court correctly held, the Sureties' claim to these funds fails as a matter of law under each of these theories.

### A.   Equitable Subrogation

Subrogation is one of the oldest of equitable doctrines that has long been recognized and enforced by New York courts.[35]  "'In the suretyship context, subrogation provides a secondary obligor [a surety] who performs the secondary

---

2006."); Brief for Defendants-Appellees Bank of America, N.A. and the Bank Group at 1 ("Here, there are no factual disputes between the parties.").

[35]   *See In re Chateaugay Corp.*, 89 F.3d 942, 947 (2d Cir. 1996); *In re QC Piping Installations, Inc.*, 225 B.R. 553, 563 (Bankr. E.D.N.Y. 1998).

obligation with the obligee's rights with respect to the underlying obligation as though that obligation had not been satisfied.'"[36]  In other words, one "compelled to pay a debt which ought to have been paid by another is entitled to exercise all the remedies which the creditor possessed against that other."[37]  As noted by the Bankruptcy Court, the parties agree that the doctrine of subrogation is applicable in this case, but they disagree as to whose shoes the Sureties may fill and to what rights the Sureties have against the bankrupt debtor.

### 1. The Sureties Are Subrogated to the Rights of Allied but Not Suprema

The Sureties claim they are subrogated to the rights of two parties: (1) Allied, the obligee, and (2) Suprema, the primary obligor.  With respect to Allied, this is the classic application of subrogation — the secondary obligor (the Sureties) stepping into the shoes of the obligee (Allied).  Subrogation to the rights of Allied, however, provides the Sureties, by definition, no greater rights than those possessed by Allied itself.  Allied possessed only the right to assert an unsecured claim against Suprema based on Suprema's failure to make payment for

---

[36]  *In re Enron Corp.*, 307 B.R. 372, 380 (S.D.N.Y. 2004) (quoting Restatement (Third) of Suretyship and Guaranty § 27 cmt. a (1996)).

[37]  *American Surety Co. of N.Y. v. Bethlehem Nat'l Bank of Bethlehem, Pa.*, 314 U.S. 314, 317 (1941) (quotation marks and citation omitted).

the milk it purchased.[38]  Accordingly, subrogation provides the Sureties' with the

same unsecured claim.[39]  That claim is subordinate to the Bank Group's secured

claims.

The more difficult question here is the Sureties' argument that they

are subrogated to the rights of the Suprema, the primary obligor.[40]  It is well-

established that in certain limited circumstances, a surety may be subrogated to the

rights of the principal obligor.  The first — and most common — instance where

this form of subrogation arises is in the construction industry.  There are at least

two unique characteristics of the construction industry that merit this form of

subrogation.  *First*, surety bonds in the construction context are not only

guarantees of payment, but are also performance bonds, where the surety promises

to step in and actually perform the construction contract and pay the laborers and

---

[38]     *See In re Suprema*, 2006 WL 2583648, at *9 ("The Sureties subrogation
rights give them no more than the rights that Allied would have had as an
unsecured seller of milk – the rights to assert unsecured claims for Suprema's
failure to pay and breach of contract.").

[39]     As noted by the Bankruptcy Court below, "New York State milk suppliers
are granted the right to make a claim against a bond but not to assert a lien on
account of nonpayment." *Id.* at *10.

[40]     *See* Brief for Plaintiffs-Appellants at 34 ("The Bankruptcy Court
overlooked that the Sureties are also subrogated to the rights of the Debtors
[Suprema], for whom the Sureties performed, arising from the bonded transaction
or, here, the Bonded Transaction Assets.").

-22-

materialmen in the event that the primary contractor defaults. *Second*, and related

to the first, is the fact that in the construction industry, there is very frequently a

retainage fund established by the owner of the project in the event of a default by

the primary contractor.  In those cases, when the surety steps in to perform the

contract and pays the laborers, it is entitled, as in the classic subrogation context,

to be subrogated to the rights of the laborers as if they had not been paid to

demand payment from the general contractor.  But the surety *also* is entitled to

step into the shoes of the primary contractor in order to receive the proceeds of the

retainage fund upon completion of the project, which but for the contractor's

default would have been paid to the contractor as consideration for the contract's

completion.[41]

---

[41]     *See Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 141 (1962) ("[T]he
Government had a right to use the retained fund to pay laborers and materialmen;
that the laborers and materialmen had a right to be paid out of the fund; that the
contractor, had he completed his job and paid his laborers and materialmen, would
have become entitled to the fund; and that the surety, having paid the laborers and
materialmen, is entitled to the benefit of all these rights to the extent necessary to
reimburse it."). *Accord In re John's Insulation, Inc.*, 221 B.R. 683, 688 (Bankr.
E.D.N.Y. 1998) ("The surety is thus subrogated to the rights of the principal, and
has rights to the funds that are due and are to become due under a contract,
including any undisbursed proceeds previously earned and any retainages held
until contract completion."); *In re Alcon Demolition, Inc.*, 204 B.R. 440, 447-48
(Bankr. D.N.J. 1997) (noting that subrogation "places the surety in the position to
exercise the debtor's rights to identifiable contract funds"); *American Ins. Co. v.
Ohio Bureau of Workers' Comp.*, 577 N.E.2d 756, 759 (Ohio App. 1991)
("[W]here the surety completes performance for the defaulting principal under the

The Sureties' claim here, as noted by the Bankruptcy Court, is distinguishable from the construction context. The Bond at issue does not provide for any performance obligation, but is merely a payment guarantee. Moreover, there is no retainage fund or similar segregation of funds that would entitle the Sureties to step into the shoes of Suprema.[42] The Sureties merely paid the debt that Suprema owed to Allied. Nothing about this case merits extension of the doctrine of subrogation to permit the Sureties to step into the shoes of Suprema.

There is also some case support for another limited circumstance that merits a secondary obligor's subrogation to the rights of the primary obligor, which arises where the obligees "by their *negligence, breach of contract or breach of warranty contributed to [the primary obligor's] default.*"[43] That exception has no application here, because Allied did not in any way contribute to or cause Suprema's default. Thus, the Sureties are not entitled to be subrogated to any of Suprema's rights.

This result is equitable. If Suprema had defaulted on its payment to

---

contract, the surety will be subrogated to the principal's right to payment by the owner upon completion of the project.").

[42]    Indeed, the Sureties had the option to demand that Suprema establish a trust account for its benefit but it never exercised that option. *See infra* Part III.B.

[43]    *Ohio Bureau of Workers' Comp.*, 577 N.E.2d at 759 (emphasis added).

Allied but had not filed for bankruptcy, the Sureties, standing in Allied shoes, would have been able to recover its payment from Suprema, and Suprema alone. The rights of the Sureties cannot be expanded based merely on the fortuity of bankruptcy. Thus, because the Sureties are only subrogated to the rights of Allied, they are limited to the assertion of Allied's claim as an unsecured creditor in the bankruptcy proceeding.

### 2.    The Subrogation Rights Here Did Not Arise Until After Suprema Filed for Bankruptcy

The Sureties' argue that their subrogation claim relates back to the date that Suprema defaulted on its payment to Allied, despite the fact that they did not make their payment until after the Petition Date. As the Bankruptcy Court found, the Sureties' obligation under the bond remained inchoate despite the default of Suprema.[44]  Indeed, before the Sureties could be, and were, called upon to make the payment under the Bond, a demand had to be made by Allied to the Commissioner, an investigation had to ensue, and the Commissioner had to file his Determination and Certification.  Only after that determination was filed did the

---

[44]    In this regard, it is important to note that the beneficiary of the Bond was the Commissioner, not Allied.

Sureties' obligation to pay become fixed and definite.[45]  This occurred *after*

Suprema filed for bankruptcy.[46]  Having incurred no loss before the Petition Date,

the Sureties had no tangible claim at the time of Suprema's filing.[47]  As a result,

the Sureties' subrogated unsecured claim to the Bonded Transaction Assets is not

superior to the secured claims of the Bank Group.

## B.  Express Trust

The Sureties' express trust claim is similarly without merit.  Under

New York law, an express trust must have: (1) a designated beneficiary; (2) a

designated trustee who is not a beneficiary; (3) an identifiable trust *res*; and (4)

---

[45]  *See In re Suprema*, 2006 WL 2583648, at *9 ("The equitable subrogation rights of the Sureties were contingent or inchoate when the default occurred on February 16, 2002, and, given the nature of the Sureties['] undertaking to the Commissioner, these rights could not be asserted until payment under the Bond.").

[46]  Again, reliance on cases from the construction industry are inapposite.  In those cases, the fact pattern is consistently as follows:  the contractor defaults *prepetition*, the surety immediately steps in — *prepetition* — to perform, and the contractor subsequently files for bankruptcy.  In those cases, the surety's entitlement to subrogation is fixed and tangible when it actually steps in to perform under the bond, which is *prepetition*.  That simply is not the case here.  The Sureties were not obligated to, and did not, make any payment under the Bond before the bankruptcy filing.  Accordingly, I agree with the Bankruptcy Court that "the precedent from [the construction] industry dealing with prepetition performance is inapposite." *In re Suprema*, 2006 WL 2583648, at *9.

[47]  *See Reliance Ins. Co. v. United States Bank of Wash., N.A.*, 143 F.3d 502, 506 (9th Cir. 1998) ("At common law, a surety does not become subrogated to its principal's right to payment from a third party until the surety performs the principal's obligations.").

actual delivery or assignment of the trust *res* with the intent of vesting legal title

with the trustee.[48] Although an express trust may be created by either a specific

written agreement or by implication from the parties' conduct, "the inference of an

intent to create an express trust must be supported by unequivocal evidence."[49]

As the Bankruptcy Court correctly held, neither the terms of the

Indemnity Agreement nor the parties' conduct were adequate to give rise to an

enforceable trust. Two of the four required elements for the creation of an express

trust were not satisfied by the Indemnity Agreement. *First*, the Indemnity

Agreement did not designate an identifiable trust *res*. By expressly permitting

Suprema to commingle alleged trust funds with non-trust assets which, by itself, is

fatal to the Sureties' claim of an express trust,[50] the Indemnity Agreement

prevented the identification of the trust res.[51] Furthermore, the terms of the

---

[48]  *See Agudas Chasidei Chabad of U.S. v. Gourary*, 833 F.2d 431, 433-34 (2d
Cir. 1987); *In re Ames Dep't Stores, Inc.*, 274 B.R. 600, 623 (Bankr. S.D.N.Y.
2002), *aff'd sub nom., LFD Operating, Inc. v. Ames Dep't Stores, Inc.*, No. 02 Civ.
6271, 2004 WL 1948754 (S.D.N.Y. Sept. 1, 2004), *aff'd*, 144 Fed. Appx. 900 (2d
Cir. 2005).

[49]  *A. Brod, Inc. v. SK&I Co., L.L.C.*, 998 F. Supp. 314, 325 (S.D.N.Y. 1998).

[50]  *See In re Ames*, 274 B.R. at 623 ("It is firmly established that if a recipient
of funds . . . is not prohibited from commingling the funds with his own monies, a
debtor-creditor relationship, not a trust relationship, exists.").

[51]  *See Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re
Koreag, Controle et Revision S.A.)*, 961 F.2d 341, 353 (2d Cir. 1992).

Indemnity Agreement did not specify whether the Milk Sales Proceeds or the Bonded Transaction Assets were to be held in trust.[52]  *Second*, there was no actual delivery of the *res* with the intent of vesting legal title in the trustee.  The Indemnity Agreement sought by its terms to extend the "trust fund" label to payments that had not yet been made, received, or become due.[53]  But funds that have not been actually delivered to the trustee cannot form part of a trust *res*.[54]  In response, the Sureties' argue that Suprema actually received $2,362,697.30 in payments from Kraft and Dairy Lea and, therefore, the Sureties have a trust in the payments that Suprema actually received at the time of its bankruptcy filing. However, Suprema's actual receipt of these monies is irrelevant to the question of whether the Indemnity Agreement, *ex ante*, appropriately described the funds that

---

[52]   The Sureties argue that they have an express trust in the Bonded Transaction Assets.  *See* Brief for Plaintiffs-Appellants at 35 ("The Sureties also established that the Bonded Transaction Assets were not part of the Debtors' bankrupt estate because those Assets were committed to a trust in favor of the Sureties under the Harleysville Indemnity Agreement.").  But only those funds that were actually collected can be held in trust.  Thus, if there is a trust in this case – which there is not – it would be with respect to the Milk Sales Proceeds, not the Bonded Transaction Assets.

[53]   The Indemnity Agreement states: "All monies due *and to become due* under any CONTRACT are also trust funds whether in the possession of PRINCIPAL(S), INDEMNITORS or otherwise." (emphasis added).

[54]   *See Acuity, A Mut. Ins. Co. v. Planters Bank, Inc.*, 362 F. Supp. 2d 885, 892 (W.D. Ky. 2005) ("One cannot contribute a trust asset as settlor of that trust until one actually owns that asset.").

were to make up the trust.  Here, the Indemnity Agreement failed to meet this

requirement as its terms did not limit the creation of a trust to those funds that had

actually been delivered to the trustee.  Such overreaching on the part of the

Sureties violates New York trust law and precludes a finding that an express trust

had been created.

Nor did the Sureties' conduct establish the creation of an express

trust.  Paragraph four of the Indemnity Agreement provides, in relevant part, as

follows:

> PRINCIPAL(S) shall, upon demand of the SURETY and
> in implementation of the trust or trusts hereby created,
> open an account or accounts with a bank or similar
> depository designated by the PRINCIPAL(S) and approved
> by the SURETY, which account or accounts shall be
> designated as a trust account or account for the deposit of
> such trust funds, and shall deposit therein all monies
> received pursuant to said contract or contracts.

A fair reading of the above provision supports the conclusion that the Indemnity

Agreement, by itself, provides an option for the parties to create a trust at a later

date, but the parties must take further action to exercise this option.  Specifically,

the Sureties must first demand that Suprema open and designate a trust account for

their benefit.  Then, Suprema must actually open such an account and deposit the

payments it made from its sales of milk into that account before an enforceable

-29-

trust can be impressed on those payments.

Here, neither the Sureties nor Suprema ever took the required action to create a trust over the Milk Sales Proceeds. During the entire period that the Bond was in effect, the Sureties never made a demand that Suprema establish a trust account. The Sureties argue that the failure to demand separate accounts for trust assets is not relevant to the existence of a trust. According to the Sureties, the above provision merely reserves the Sureties' right to revoke the trustee's power to commingle trust and non-trust assets by requiring separate bank accounts for trust assets – it does not establish a precondition to the creation of a trust. I disagree. As aptly stated by the Bankruptcy Court: "The Sureties are unable to prevail on a trust fund theory because Suprema took no action to distinguish those payments that were supposed to be subject to the alleged trust from Suprema's other cash receipts."[55]

---

[55]     *In re Suprema*, 2006 WL 2583648, at *13. In distinguishing between a trust and a debt in bankruptcy, courts focus on "whether the alleged trust funds are required to be segregated." *In re First Fin. Corp.*, 269 B.R. 481, 495 (Bankr. E.D.N.Y. 2001) (citing *Fox v. Shervin (In re Shervin)*, 112 B.R. 724, 734 (Bankr. E.D.Pa. 1990) ("It is understood that when the 'trustee' of the funds is entitled to use them as his or her own and commingle them with his or her own money, a debtor-creditor relationship exists, not a trust") and *Dampskibsselskabet Af 1912 Aktieselskab v. Black & Geddes, Inc. (In re Black & Geddes, Inc.)*, 35 B.R. 830, 836 (Bankr. S.D.N.Y. 1984) ("It is a firmly established principle that if a recipient of funds is not prohibited from using them as his own and commingling them with his own monies, a debtor-creditor, not a trust, relationship exists")).

In sum, neither the terms of the Indemnity Agreement nor the conduct of the parties was sufficient to establish an express trust. And without an express trust, the Sureties' unsecured claims cannot defeat the superior claim of the Bank Group.

## IV.   CONCLUSION

For the reasons discussed above, the Bankruptcy Court's Order granting summary judgment in favor of the Bank Group is affirmed. The Clerk of the Court is directed to close this appeal.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            May 7, 2007

-31-

## - Appearances -

**For Plaintiffs-Appellant, Harleysville**
**Worcester Mutual Insurance Company:**

David Westermann, Jr., Esq.
Matthew Didora, Esq.
Westermann Hamilton Sheehy
  Aydelott & Keenan, LLP
Garden City Center, Suite 502
100 Quentin Roosevelt Boulevard
Garden City, New York 11530
(516) 794-7500

**For Plaintiff-Appellant Lumbermens**
**Mutual Casualty Insurance Company:**

Thomas A. Draghi, Esq.
John E. Westerman, Esq.
Westerman Ball Ederer
  Miller & Sharfstein, LLP
170 Old Country Road, Suite 400
Mineola, New York 11501
(516) 622-9220

**For Defendants-Appellees:**

Brian Trust, Esq.
Laura D. Metzger, Esq.
Mayer, Brown, Rowe & Maw LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

David M. Gossett, Esq.
Tai Lui Tan, Esq.
Mayer, Brown, Rowe & Maw LLP
1909 K Street, N.W.
Washington, D.C. 20006
(202) 263-3000